Jimmie L. **QUERNER**, Individually and as Beneficiary and Successor Administrator of, and Distributee of an Undivided One-Half of the Claims of the Estate of Patti Jean Querner, Deceased, and Thera Querner, Individually and as Beneficiary and Successor Administrator of, and Distributee of One-Half of the Claims of the Estate of Patti Jean Querner, Deceased, Appellants,

v.

James A. **RINDFUSS**, Appellee.

No. 04-97-00190-CV.

Court of Appeals of Texas, San Antonio.

Feb. 25, 1998.

Rehearing Overruled March 31, 1998.

Daniel P. Neelon, Daniel P. Neelon, Esq., A. Chris Heinrichs, A. Chris Heinrichs, P.C., San Antonio, for Appellants.

George H. Spencer, Jr., Tyler Scheuerman, Clemens & Spencer, San Antonio, for Appellee.

Before HARDBERGER, C.J., and LÓPEZ and STONE, JJ.

## OPINION

HARDBERGER, Chief Justice.

This case pits the privilege afforded attorneys in litigation against claims of fraud, breach of fiduciary duty and other assorted acts of wrongdoing. We find that many communications and acts of an attorney are protected by the litigation privilege, but not everything. The privilege is broad, but not absolute. We are sensitive to the need and reasons for an attorney to have a broad litigation privilege defense to enable the attorney to vigorously represent his or her client. However, we reject the argument that public policy requires an absolute privilege for every act or communication of an attorney simply because it is part of the litigation process.

Appellants, Jimmie L. Querner ("Jimmie") and Thera Querner ("Thera"), appeal a summary judgment granted in favor of appellee, James A. Rindfuss ("Rindfuss"). Jimmie and Thera (collectively referred to as the "Querners") raise thirteen points of error contending the trial court erred in granting summary judgment: (1) on their claims of civil conspiracies, fraud, unlawful conversion, unjust enrichment, DTPA, constructive

fraud, and breach of fiduciary duties because a material question of fact was presented as to each of these claims; (2) on all claims based on any alleged privilege; (3) on all claims based on any alleged res judicata or collateral estoppel; (4) on all claims based on the absence of standing or authority to sue; and (5) on all claims relating to Rindfuss's violation of Rule 13 of the Texas Rules of Civil Procedure and section 9.001 of the Texas Civil Practice and Remedies Code. We affirm the trial court's judgment in part and reverse the trial court's judgment in part, and we remand the cause for trial.

## FACTUAL HISTORY

Patti Jean Querner died on December 17, 1991. Her will designated the Querners, her children, as her beneficiaries and named Welda Gay Zinn ("Zinn") as independent executrix. On January 8, 1992, Rindfuss was retained to assist in the probate of the estate. Zinn was qualified to act as independent executrix on January 21, 1992.

Each of the Querners was represented by an independent attorney during the course of the probate proceedings. Conflict between the Querners appears to have had an adverse effect on the probate proceedings, requiring an inordinate amount of legal work in administering the estate.

During the course of the estate's administration, various accountings and an application for the sale of certain real estate were filed. Rindfuss signed these documents as the attorney for the estate.

A final accounting was filed on September 15, 1993. On October 1, 1993, the probate court held a hearing to consider objections to the final accounting. Before the hearing commenced, Rindfuss announced that he had been instructed to withdraw the final accounting and request a continuance because Zinn intended to withdraw as independent executrix. Dan Rutherford appeared as independent counsel for Zinn. Rindfuss explained that Zinn had informed him that she intended to file a claim against the estate and resign. Rindfuss informed Zinn that she would need to seek the advice of independent counsel because her assertion of a claim against the estate created a conflict of inter-

est. Rindfuss then stated that the final accounting would actually be an accounting from Zinn to the successor administrator but would need to be amended to include Zinn's unliquidated claim.

At the conclusion of the hearing, the probate court accepted Zinn's resignation and appointed Charles Jackson as successor administrator of the estate. The trial court then directed that Zinn file an accounting and set a hearing on that accounting.

The hearing on the final accounting commenced on November 19, 1992, and was continued and completed on November 30, 1993. Rindfuss responded to the various objections that had been filed by the Querners and Jackson, with the exception of the objections relating to the health care costs, stating that he would leave that issue to Zinn. On cross-examination, Rindfuss stated that the original checks written by Zinn during the course of the estate administration were in his possession once or twice. Rindfuss stated that he never went through each check. Rindfuss further stated that the original checks had been made available in the courtroom pursuant to a court order at one time during the probate proceedings.

Rindfuss was asked about the last time he saw the original checks. Rindfuss said that he saw the original checks immediately before the checks were boxed and sent by courier to a copy business on the Friday before the hearing pursuant to the court's order. Rindfuss said that he assisted Zinn in boxing the checks because she resisted complying with the court's order based on her concern for her responsibility if any of the original checks were lost. Rindfuss stated that after the checks were returned to Zinn, she called and informed him that the original checks were in disarray and some checks were missing.

Prior to the hearing, the probate court ordered Zinn and Rindfuss to make all the original documents supporting the final accounting available at Rindfuss's office from November 2, 1993, through November 17, 1993. Rindfuss said that the documents were in Zinn's office because she needed them available to organize them. Rindfuss

stated that he could have had the documents in his office anytime anyone set an appointment during that period.

Rindfuss was also asked about the manner in which Zinn paid the estate's bills and particularly about the bills from Paragon Healthcare. Rindfuss stated that he did not keep track of the manner in which Zinn paid the bills because that was her responsibility as the executrix. When an objection was raised regarding the payment for Paragon's services based on a statement rather than the actual invoices, Rindfuss stated that he became involved to see if the bill could be better documented by the invoice. Rindfuss said that he called Paragon to request the original invoices and subsequently received a call from Zinn stating that she had received all of the necessary invoices. Rindfuss testified that the invoices received by Zinn were never in his office, and he never examined them prior to the hearing.

When questioned regarding Paragon extending the decedent credit in excess of $100,000 before demanding payment, Rindfuss stated that it seemed odd but that the decedent must have had wonderful credit. When questioned regarding the reason payments would be made to Paragon when a Paragon statement showed a zero balance prior to the decedent's death, Rindfuss responded that he assumed additional bills came in later since there were numerous nurses that cared for the decedent.

The decedent's personal attorney, Ron Johnson, also testified at the hearing regarding the reasonableness of Rindfuss's fees. Johnson testified regarding the antagonism between the Querners and the difficulty in reaching any amicable resolution of issues as a result. Johnson stated that the Querners had taken a $25,000 bankruptcy and made it into the most complex bankruptcy case he had ever seen, resulting in a payment of $70,000 in attorney's fees to the bankruptcy estate's attorney. Johnson said that prior to the decedent's death, she moved into a secured access apartment and changed her phone number several times because she was weary of the Querners' "eternal game of Mommy loves you more than she loves me and it's not fair." Johnson stated both Querners had been accused of violating the "in terrorem" clause of the will, which would result in the forfeiture of their right to receive any distributions as beneficiaries. In view of the litigious nature of the beneficiaries, Johnson concluded that Rindfuss's fees were reasonable. Raul X. Villarreal, another probate attorney, also testified that the fees were reasonable.

Zinn also testified at the hearing. Zinn stated that all of the original checks were delivered to the courier for copying, but upon their return, the checks for the nursing home bills and medical bills were missing. As its relates to Rindfuss, Zinn confirmed that the invoices she received from Paragon prior to the hearing were never delivered to Rindfuss. In response to questioning regarding a Paragon invoice that was still missing, Zinn responded that she would have the invoice at any time.

Thera's attorney called the courier who retrieved the original checks from Zinn for copying and two employees of the copy business to testify. The courier said that he delivered everything that he received from Zinn to the copy business. The employee that copied the documents testified that there were no original checks in the box that was delivered. This contradicts Rindfuss's testimony that he saw the original checks and assisted Zinn in placing them into the box for delivery.

At the end of the hearing, the probate court approved the legal fees. The probate court also distributed any claims the estate might have for reimbursement of nursing home or nursing expenses to the Querners.

Rindfuss withdrew as attorney in May of 1994. Sometime in 1994, inconsistencies between the copies of the checks attached to the accountings and the original checks written by Zinn were discovered, together with inconsistencies between the Paragon expenses set forth in the accountings and the actual Paragon invoices, and claims were filed against Zinn. On September 10, 1994, the probate court approved a settlement of those claims and entered a final judgment against Zinn. In the judgment, the probate court found that Zinn misappropriated funds

and other property, breached her duty of good faith, and engaged in fraud and various other bad acts. The probate court awarded the Querners $250,000 in actual damages, and $500,000 in punitive damages.

On May 5, 1995, the probate court ordered the distribution of the estate. In its order, the probate court distributed the claim of the estate, if any, as may be determined against Rindfuss or Rutherford or Jackson or Intertect, Inc. to the Querners equally. On July 21, 1995, Jimmie filed the original petition in the suit underlying this appeal, alleging thirteen causes of action against Rindfuss and also asserting claims against Rutherford. Thera subsequently intervened in the case. The trial court granted a summary judgment in favor of Rindfuss, which it severed from the claims against Rutherford. The Querners appeal the summary judgment.

### PRIVILEGE

■ In each of their first eight points of error, the Querners assert that the trial court erred in granting summary judgment based on any alleged privilege asserted by Rindfuss because his actions were taken in the litigation context. In his brief, Rindfuss contends that the totality of his dealings with the Querners were in the context of a highly-contested probate litigation and that all statements made and actions taken relative to the Querners were in that context. Because the actions arose in the litigation context, Rindfuss contends his actions are absolutely privileged from tort liability based on public policy considerations. We disagree with Rindfuss that fraudulent actions by an attorney in a litigation context are absolutely privileged.

■ If an attorney acting for his client participates in fraudulent activities, his action is "foreign to the duties of an attorney." *Poole v. Houston & T.C. Ry. Co.*, 58 Tex. 134, 137 (1882); *McKnight v. Riddle & Brown, P.C.*, 877 S.W.2d 59, 61 (Tex.App.—Tyler 1994, writ denied); *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 472 (Tex. App.—Houston [1st Dist.] 1985, no writ). An attorney, therefore, is liable if he knowingly commits a fraudulent act or knowingly enters into a conspiracy to defraud a third person.

*Likover*, 696 S.W.2d at 472. Even in the litigation context, a lawyer cannot shield himself from liability on the ground that he was an agent because no one is justified on that ground in knowingly committing a willful and premeditated fraud for another. *Poole*, 58 Tex. at 137–38; *Likover*, 696 S.W.2d at 472; *Hennigan v. Harris County*, 593 S.W.2d 380, 383 (Tex.Civ.App.—Waco 1979, writ ref'd n.r.e.).

Rindfuss is incorrect in asserting a global privilege as to all actions taken in the litigation context. Each claim must be considered in light of the actions shown to have been taken by Rindfuss in order to determine whether he can be held liable for such actions. If an attorney actively engages in fraudulent conduct in furtherance of some conspiracy or otherwise, the attorney can be held liable.

### STANDING/AUTHORITY TO SUE

■ In each of their first seven points of error and in points of error ten and eleven, the Querners assert that the trial court erred in granting summary judgment on the basis that they lacked standing or authority to assert their claims. The Querners contend that they were the beneficial owners of the estate's assets and claims upon their mother's death, and the distribution of those claims in the course of a probate proceeding differs from an assignment of those claims in another context. Rindfuss responds that because he was never the attorney for the Querners, he did not owe the Querners any fiduciary duties. Rindfuss further contends that because the Querners did not seek or acquire his services, they do not have standing as consumers under the DTPA.

■ Claims arising during the probate of an estate may be distributed to the beneficiaries similar to other property upon the final settlement of an estate. *See* TEX. PROB.CODE ANN. § 409 (Vernon Supp.1998)(requiring court to distribute remaining estate upon final settlement). To hold otherwise would deprive the probate court of the authority to reach a final settlement in any probate proceeding in which a potential claim by the estate has arisen without adversely affecting

the beneficiaries' interest in pursuing that claim. Depriving the probate court of such authority would enable an executor and an attorney, who have engaged in fraudulent activity, to prevent the very act that they were appointed and retained to achieve—final settlement and distribution of the estate. A probate court may have compelling reasons for ordering a final distribution before a potential claim by the estate can be litigated. Permitting the probate court to distribute such claims provides the probate court with the flexibility to finalize the probate of an estate while preserving the rights of the beneficiaries to any claims that may have arisen during the course of the probate proceeding.

At least one court appears to have recognized the beneficiaries' right to sue for actions taken by an attorney hired to advise the executors in administering an estate. *See Vinson & Elkins v. Moran*, 946 S.W.2d 381 (Tex.App.—Houston [14th Dist.] 1997, n.w.h.). In *Moran*, the beneficiaries of an estate sued a law firm alleging professional negligence, breach of fiduciary duty, conspiracy and DTPA violations. *Id.* at 386. The claims arose out of the law firm's alleged misconduct and mishandling of legal matters in connection with the administration of the estate. *Id.* The court of appeals initially held that the beneficiaries could not assign their claims against the law firm to each other. *Id.* at 389–97. The court also noted, however, that one beneficiary who had assigned his claim filed a cost bond and a cross-point asking the court to allow him to prosecute his claims directly against the law firm in the event the court determined that the assignment was invalid. *Id.* at 400. The court held that the beneficiary was entitled to a remand for an opportunity to prosecute any claims he might have against the law firm. *Id.*

The *Moran* court then addressed the beneficiaries' ability to directly recover on their claims. *Id.* The law firm raised complaints concerning privity and DTPA consumer status similar to those raised by Rindfuss in this case. *See id.*

 Although an attorney hired by an executor generally represents the executor and not the beneficiary, an attorney for an executor may undertake to perform legal services as attorney for one or more beneficiaries. *Id.* at 402. An attorney-client relationship may develop between the attorney retained by the executor and the beneficiaries either expressly or impliedly. *Id.; see also Burnap v. Linnartz*, 914 S.W.2d 142, 148 (Tex.App.—San Antonio 1995, writ denied)(relationship may be implied by conduct of parties). Even absent an attorney-client relationship, an attorney may be held negligent for failing to advise a party that he is not representing the party. *Burnap*, 914 S.W.2d at 148. "If circumstances lead a party to believe that they are represented by an attorney," the attorney may be held liable for such a failure to advise. *Id.* Furthermore, the Texas Supreme Court has recognized the difficulty in formulating a comprehensive definition of "fiduciary" sufficient to encompass all cases. *General Resources Organization, Inc. v. Deadman*, 907 S.W.2d 22, 31 (Tex.App.—San Antonio 1995)(citing *Crim Truck & Tractor Co. v. Navistar Intern. Transp. Corp.*, 823 S.W.2d 591, 593 n. 3 (Tex.1992), *writ denied*, 932 S.W.2d 485 (Tex. 1996). Informal fiduciary relationships or confidential relationships may arise where one person in trust relies upon another or where influence has been acquired and abused or confidence has been reposed and betrayed. *Id.* The existence of such an informal fiduciary relationship or confidential relationship is a question of fact. *Id.*

In Jimmie's affidavit filed in response to the motion for summary judgment, he states that Rindfuss continually represented himself to be the attorney for the estate. The summary judgment evidence also contains a letter drafted by Rindfuss to Thera's attorney stating that although he was employed by Zinn, "I am the attorney for the Estate as opposed to the attorney for the Independent Executrix. As the attorney for the Estate, I should be familiar with all of the facts before any matter is presented to the Court." The letter states that Rindfuss will keep the beneficiaries fully apprised of both Zinn's position and the other beneficiary's position on the interpretation of the will.

Whether this evidence is sufficient to sustain a finding of privity or fiduciary relationship is not the issue before us in this appeal. In light of Rindfuss's own representations regarding the nature of his relationship to the estate and his execution of accountings in keeping with that representation, we believe there is some evidence that requires us to permit this issue to be submitted to a jury for factual resolution.

■ With respect to the Querners' status as a consumer under the DTPA, we hold that the Querners do not have that status for the same reasons expressed in *Moran.* 946 S.W.2d at 406–410. The executors are empowered to hire and consult an attorney and act on the attorney's advice on behalf of the estate. *Id.* at 408. The purpose of retaining an attorney is to obtain legal services for the administration of the estate as a whole. *Id.* Any benefit derived by the beneficiaries is incidental to the main purpose. *Id.* This does not give the beneficiaries consumer status under the DTPA. *Id; cf. Wright v. Gundersen,* 956 S.W.2d 43, 48 (Tex.App.— Houston [14th Dist.] 1996, n.w.h.).

### RES JUDICATA/COLLATERAL ESTOPPEL

■ In their ninth point of error, the Querners contend that the trial court erred in granting summary judgment based on Rindfuss's assertion that his fees were fully and fairly litigated in the probate proceeding. Rindfuss counters that the approval of his fees by the probate court prevents the Querners from collaterally attacking his fees based on the principles of res judicata and collateral estoppel.

■ Res judicata generically encompasses both claim preclusion (res judicata) and issue preclusion (collateral estoppel). *Barr v. Resolution Trust Corp.,* 837 S.W.2d 627, 628 (Tex.1992). Res judicata in only applicable where there is: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action. *McGee v. McGee,* 936 S.W.2d 360, 363 (Tex.App.—Waco 1996, writ denied). To invoke the doctrine of collateral estoppel, a party must establish: (1) the facts sought to be litigated in the first action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action. *Ayre v. J.D. Bucky Allshouse, P.C.,* 942 S.W.2d 24, 27 (Tex.App.—Houston [14th Dist.] 1996, writ denied).

We hold that neither res judicata nor collateral estoppel is applicable in this case. The probate court reviewed and approved the reasonableness of Rindfuss's fees in view of the work performed in the absence of any fraudulent activity on the part of Rindfuss. In this case, the issue presented is whether Rindfuss would be entitled to any fee if he engaged in the wrongful acts alleged by the Querners. The Querners are not challenging the amount of the fees Rindfuss received but whether he was entitled to any fees in view of the alleged wrongful acts.

### RULE 13 AND SECTION 9.001

■ In their twelfth and thirteenth points of error, the Querners assert that the trial court erred in granting summary judgment based on Rindfuss's contention that claims for violation of rule 13 of the Texas Rules of Civil Procedure and section 9.001 of the Texas Civil Practice and Remedies Code must be filed in the probate court in which the pleadings containing the statements underlying those claims were made. We agree. The basis for the Querners' claims was not a pleading filed in the probate proceedings. Other than noting the manner in which Rindfuss referred to himself in those pleadings, the claims asserted by the Querners are based on Rindfuss's alleged fraudulent actions, not the probate pleadings.

### MATERIAL ISSUES OF FACT

In each of their first seven points of error, the Querners assert that the trial court erred in granting summary judgment on seven of their claims because the evidence raised a material issue of fact regarding each of these claims. Rindfuss only addresses the evidence relating to the conversion claim. Rindfuss asserts that since the Querners

only address seven of their thirteen causes of action in their brief, even if we agree that a material fact issue is raised regarding those seven claims, we must affirm as to the other six causes of action.

We agree with Rindfuss and affirm the summary judgment as to the six claims to which the Querners do not assign error relating to the summary judgment evidence: gross negligence, negligence, intentional infliction of emotional distress, negligent misrepresentation, grossly negligent misrepresentation, and breach of contract. Since the trial court could have granted summary judgment on the basis that no material fact question was raised on these claims, the Querners' failure to assign error results in an affirmance of the trial court's judgment as to those claims.

Since the Querners lack consumer status to assert their DTPA claim, we only need to further address the claims for fraud, conversion, conspiracy, unjust enrichment, breach of fiduciary duty; and constructive fraud.

■ We do not adopt the Querners' position that Rindfuss's signature on the application for sale of real property and the accountings is evidence of his collusion. Rindfuss explained that he prepared those documents by adopting figures provided to him by the accountants or Zinn. He stated that in completing the accountings, the amounts reflected for payments made were given to him by Zinn from the check register. He stated that Zinn never consulted him regarding the adequacy of the documentation of the bills she was paying and that he forwarded any bills he received to her for payment. He stated that the payment of bills was Zinn's job as executrix. He further testified that he never knew Zinn was paying expenses based on statements rather than original invoices until an objection was made. At that time, he stated that he got involved in an effort to document the bills. He further explained, however, that he was involved by phoning Paragon to request the original invoices. He stated that he never saw the invoices that Paragon subsequently delivered but was told by Zinn that those invoices had arrived. This testimony was not controverted.

■ If we held that Rindfuss's signature on the applications and accountings was evidence of collusion or other wrongful acts, we would impose a fiduciary responsibility on the attorney for the executrix to ensure that the executrix performs her fiduciary responsibility to the estate. That is not the attorney's job. The Texas Probate Code leaves to the testator the discretion of requiring an executrix to file a bond to ensure that she performs in accordance with her fiduciary responsibility. *See* TEX. PROB.CODE ANN. § 195(a) (Vernon Supp.1998). It does not require the appointment of an attorney to act as a guarantor of the executrix's actions. Even in cases in which a bond is not required by the will, the Texas Probate Code has a procedure for requiring the executrix to file such a bond upon the filing of a complaint by certain interested individuals. *See id.* at § 214 (Vernon Supp.1998).

■ In addition, we do not believe Rindfuss's inquiry at the hearing regarding the invoice Zinn stated would be available at any time raises a material issue of fact in light of the explanation provided. At the hearing, Rindfuss inquired:

MR. RINDFUSS: Excuse me. Is that the one for $7,500 and we only had to pay $4,500 or whatever it was?

THE COURT: $5,457.18.

MR. RINDFUSS: $5,457.18. I may have kept—somehow I think that was the one. There's a chance I may have made a copy and I'll go look for it.

This response by Rindfuss is explained by a letter he forwarded to Zinn on April 28, 1992 that is contained in the final accounting. That letter states that Rindfuss's secretary located an invoice in the decedent's documents that she was sorting in the amount of $7,579.63 to Paragon Home Care Corp. The letter directs Zinn to determine if the bill had been paid, and if not, to contact Paragon to determine what amount insurance had paid and the balance owed. The letter in our record contains a handwritten note that states "Outstanding 6–4–92—ck'd—still outstanding Pd $5,457.18 pending outcome as per PHC." Rindfuss's recollection of this particular invoice and his statement that he may

have that particular invoice are explained by the fact that he forwarded the letter to Zinn and the payment amount related to the invoice he forwarded. This evidence is not controverted.

■ The only evidence in our record that raises a material issue of fact is the conflict in Rindfuss's testimony regarding the delivery of the original checks to the courier for copying and the availability of the original documents during the court-ordered inspection period. Rindfuss's testimony regarding the delivery of the original checks is controverted by the testimony of the employee of the copy business who stated that no original checks were delivered. Rindfuss's testimony that he would have made the original documents available to anyone at anytime during the court-ordered inspection period is controverted by Jimmie's affidavit. Jimmie says that he went with his attorney to Rindfuss's office on November 9, 1993, and that his attorney asked for the original checks, but Rindfuss did not provide them.

This evidence raises a material issue of fact as to whether Rindfuss engaged in fraud and converted the estate's assets through a conspiracy with Zinn. If the Querners are successful in proving these claims and in proving that Rindfuss was in privity with them or otherwise owed them fiduciary duties, then the Querners may also be able to recover under their unjust enrichment, breach of fiduciary duty, and constructive fraud claims. We note these claims are actionable against Rindfuss because, if true, Rindfuss would have engaged in fraudulent actions.[1]

We emphasize that this court has no opinion regarding the merits of the claims against Rindfuss. We simply conclude that a fact question has been raised that defeats the summary judgment. In this summary judgment proceeding, Rindfuss was the movant. Texas law holds that a summary judgment is a harsh remedy requiring strict construction. *Garcia v. John Hancock Variable Life Ins. Co.,* 859 S.W.2d 427, 435 (Tex.App.—San Antonio 1993, writ denied). Under our applica-

ble standard of review, we are required to take as true *all* evidence favoring the non-movant and indulge *every* reasonable inference in his favor. *Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 510 (Tex.1995); *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). In addition, any doubt is resolved in favor of the non-movant. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d at 548–49. A summary judgment is not intended to permit a trial by deposition or affidavit, and we may not resolve issues by weighing the relative strength of the conflicting facts and inferences. *Garcia v. John Hancock Variable Life Ins. Co.,* 859 S.W.2d at 435. In view of this standard and the evidence presented, we find that a fact question has been raised relating to the Querners' fraud, conversion, conspiracy, unjust enrichment, breach of fiduciary duty, and constructive fraud claims that must be resolved by a jury.

CONCLUSION

Fraud vitiates all privileges. An attorney can be held liable for engaging in fraudulent acts, if proven, even if those actions are undertaken in the context of litigation.

The Querners are not barred from asserting their claims based on the probate court's approval of Rindfuss's fees because the probate court's review did not take into account any of the alleged fraudulent activities, and the Querners have standing to sue on claims distributed to them by the probate court in closing the estate administration. In addition, the Querners have raised a fact issue regarding whether they are in privity with Rindfuss or whether a fiduciary relationship arose between the Querners and Rindfuss. However, the Querners are not consumers under the DTPA.

The Querners have raised a material issue of fact regarding their claims for fraud, conversion, conspiracy, unjust enrichment, breach of fiduciary duty, and constructive fraud. The trial court's judgment in favor of Rindfuss as to those claims is reversed, and

---

1. Fraudulent actions even in the litigation context are not privileged. *Poole,* 58 Tex. at 137–38; *Likover,* 696 S.W.2d at 472.

those causes are remanded to the trial court for trial. The trial court's judgment in favor of Rindfuss as to the Querners' claims for gross negligence, negligence, intentional infliction of emotional distress, negligent misrepresentation, grossly negligent misrepresentation, and breach of contract is affirmed.